# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 11, 2025

Lyle W. Cayce
Clerk

———————

No. 22-10974

———————

Tracy Langiano,

*Plaintiff—Appellant*,

*versus*

City of Fort Worth, Texas; Landon Rollins,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:21-CV-808

———————————————————————

Before Jones, Richman, and Ho, *Circuit Judges*.
Priscilla Richman, *Circuit Judge*:

Tracy Langiano alleges that he was shot and injured by Officer Landon Rollins in violation of the Fourth Amendment, and that the violation was the result of the City of Fort Worth's policies. The district court denied a motion by Langiano to stay his civil suit while criminal charges were pending against him. The district court granted summary judgment in favor of Officer Rollins and the City of Fort Worth. For the reasons that follow, we affirm.

No. 22-10974

# I

The facts recited in this opinion are from the summary judgment record. We consider them in the light most favorable to Tracy Langiano. We do not consider factual assertions in his briefing in our court that have no citation to the record.

Langiano was accused of sexually abusing two children, who were his step-granddaughters. Police began investigating the accusations, and Langiano vacated the home so that Child Protective Services would not remove the children. Langiano penned a suicide note but threw it away before he left the house. The note was found in the trash by one of his sons. Langiano subsequently sent a text message to another son, directing what should be done with some of his possessions. A similar text was sent to a cousin. Langiano checked into a motel room. A police report reflects that Langiano recounted that he lay down on a bed, and held a loaded handgun with which he planned to shoot himself when it was nighttime.

Langiano's son called the police to tell them that his father had left a suicide note, to describe the car his father was driving, and to tell them that Langiano had a handgun. Then, the police sent out a city-wide alert. A team of police officers, including Landon Rollins, spoke with Langiano's son who again explained that Langiano had a handgun and was planning to kill himself. According to Officer Rollins, locating Langiano was a priority because "[i]t's been our experience that people that have been involved [in] [] allegations [made] by their own family members, especially ones that are sexual in nature, are a much higher risk for not only suicide, but murder/suicide with the family."

A team of police officers determined Langiano's vehicle was at a motel and went to that location. The police called Langiano's cellphone, but he did not answer. Although Langiano initially alleged in district court that Officer

Rollins had been informed by Langiano's family members that he was doing better, he later corrected the misstatement and admitted this was untrue.

Without knocking, Officer Rollins went into the motel room first with backup behind him. Although Officer Rollins was not wearing a body camera because earlier work required plain clothes, Officer Guadarrama, who entered the motel room after Officer Rollins, wore one. When he opened the door, Officer Rollins alleges that he immediately saw that Langiano's gun was pointed at him. Langiano disputes this. In an interview by police while Langiano was in the hospital, a day after the shooting, Langiano recounted that when Rollins came through the door of the motel room, "I had the pistol in my hand and—I didn't point it at him. But, he shot me twice, and at that time, then, he popped around, behind the door, shot me three more times for good measure. And [] at that time I didn't have a hold of the pistol up anymore."

Later in the same interview, Langiano recalled details somewhat differently, saying:

> [Langiano]: I don't blame him for shooting me the first two times. But the three for good measure was a little overboard. I wasn't planning on him, uh, you know, like I said, it wasn't for any cop, it was for me. You know. And, just, I had gone back to sleep, I was going to wait until nighttime. And I was telling myself what I was going to do, and it's over in a flash. It's over in a flash. I kept telling myself that. Yeah, and I had just fallen asleep when they came in through the door. And I, sit up, the gun—the first two—I don't blame him. You know, I had the gun in my hand, I don't think I was pointing it at him. I—I think I was surprised—
>
> [Detective]: Maybe kinda raised up like—whoa.
>
> [Langiano]: Yeah. He shot me twice. And, uh, you know, I get that. And then he jumped back behind the door, and I was

woozy, falling down. He came over, came back from behind the door, gun was still in my hand cause it was tangled up. But I was falling down, and he shot me three more times in the ass. And . . . I don't think he needed to do that.

[Detective]: Was that when the gun fell, after that?

[Langiano]: [T]he gun was tangled up in my hand after the first two.

[Detective]: I gotcha.

[Langiano]: You know, and I was falling over. You know, [] I don't hold no ill will against him, but I don't think he needed the three for good measure.

An audio recording from Officer Guadarrama's body camera recorded Rollins saying, "Tracy—no, no, no!" and "Gun!" before shots were fired.

It is undisputed that Rollins fired six non-fatal shots, five of which hit Langiano in his buttocks and one of which missed. The police officers then called for medical assistance, and Langiano was transported to a hospital. The body camera footage from the other officers did not capture Langiano or the position of his gun when Officer Rollins shot him.

Because this was an officer-involved shooting, the City of Fort Worth (City) conducted an investigation. The matter was submitted to a grand jury, but the grand jury voted not to take criminal action based on Officer Rollins's alleged use of deadly force.

While the criminal case involving his step-granddaughters was pending, Langiano filed this § 1983 suit against Officer Rollins and the City. The parties proceeded with the civil case for almost a year until the close of discovery. During the discovery period, the City and Officer Rollins attempted to depose Langiano. However, the criminal case was still pending and Langiano invoked his Fifth Amendment rights for every question he was asked during the deposition which related to the day of the shooting.

No. 22-10974

After the close of discovery, the City and Officer Rollins moved for summary judgment. Langiano then moved to stay the civil case pending the outcome of the criminal case. The district court denied Langiano's motion for a stay. It then granted summary judgment in favor of the City and Officer Rollins and dismissed Langiano's civil suit. Langiano timely appealed.

## II

We first analyze whether the district court abused its discretion in denying Langiano's motion to stay the civil proceedings while the criminal proceedings were pending.[1] "A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence."[2]

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."[3] "[A] civil plaintiff has no absolute right to both his silence and his lawsuit,"[4] but federal courts "defer[] civil proceedings pending the completion of parallel

---

[1] *See McKnight v. Blanchard*, 667 F.2d 477, 479 (5th Cir. 1982); *United States v. Simcho*, 326 F. App'x 791, 792 (5th Cir. 2009) (per curiam) ("The decision whether . . . to stay civil litigation in deference to parallel criminal proceedings is discretionary. Accordingly, we review the denial of a motion to stay for abuse of discretion." (quoting *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77 (1st Cir. 2004))).

[2] *Certain Underwriters at Lloyd's, London v. Axon Pressure Prod. Inc.*, 951 F.3d 248, 256 (5th Cir. 2020) (quoting *CenterPoint Energy Hous. Elec. LLC v. Harris Cty. Toll Rd. Auth.*, 436 F.3d 541, 550 (5th Cir. 2006)).

[3] *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).

[4] *Wehling v. Columbia Broad. Sys.*, 608 F.2d 1084, 1088 (5th Cir. 1979).

No. 22-10974

criminal prosecutions *when the interests of justice*" require.[5] A district court must "weigh competing interests"[6] and should only grant a stay when "special circumstances" exist, such as "the need to avoid 'substantial and irreparable prejudice.'"[7]

Langiano has not explained how denying the stay resulted in substantial and irreparable prejudice. He gave his recollection and recounting of the shooting shortly after it occurred. There is no reason to believe that his statements after the shooting were untruthful or unreliable. Awaiting a day at some point in the future when Langiano's Fifth Amendment rights are no longer in play is highly unlikely to result in probative evidence regarding his civil suit against Rollins and the City. The prejudice to Rollins and the City, however, is evident. The case had been pending for over a year and discovery was already complete. The case was ripe for resolution. Delaying that resolution for an indeterminate amount of time would adversely affect not only the defendants' rights but the public's interest in having this lawsuit resolved expeditiously.

The district court did not abuse its discretion in denying Langiano's motion to stay.

---

[5] *United States v. Kordel*, 397 U.S. 1, 12 n.27 (1970) (emphasis added); *see also Simcho*, 326 F. App'x at 793 (stating district court properly balanced the interests of those who would be affected by the stay).

[6] *Landis*, 299 U.S. at 255.

[7] *United States v. Little Al*, 712 F.2d 133, 136 (5th Cir. 1983) (quoting *SEC v. First Financial Group of Tex., Inc.*, 659 F.2d 660, 668 (5th Cir. 1981)); *see also Simcho*, 326 F. App'x at 792-93 ("[T]he granting of a stay of civil proceedings due to pending criminal investigation is an extraordinary remedy, not to be granted lightly.") (quoting *In re Who's Who Worldwide Registry, Inc.*, 197 B.R. 193, 195 (Bankr. E.D.N.Y. 1996))).

No. 22-10974

# III

We now address the grant of summary judgment.  Our review is de novo.[8]  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[9]  "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmovant,"[10] and the "facts must be particularized, not vague or conclusory."[11]  "While we review the evidence in the light most favorable to the nonmoving party, 'conclusional allegations and unsubstantiated assertions may not be relied on as evidence by the nonmoving party.'"[12]

# A

Officer Rollins moved for summary judgment, arguing he is entitled to qualified immunity.  Qualified immunity protects public officials "from undue interference with their duties and from potentially disabling threats of liability"[13] "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

---

[8] *See West v. City of Houston*, 960 F.3d 736, 740 (5th Cir. 2020) (per curiam) (citing *Petzold v. Rostollan*, 946 F.3d 242, 247 (5th Cir. 2019)).

[9] Fed. R. Civ. P. 56(a).

[10] *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 377 (5th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[11] *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 161 (5th Cir. 2021) (citing *Kariuki v. Tarango*, 709 F.3d 495, 505 (5th Cir. 2013)).

[12] *West*, 960 F.3d at 740 (quoting *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011)).

[13] *Elder v. Holloway*, 510 U.S. 510, 514 (1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)).

known."[14]  "A public official is entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation."[15] "[W]e 'may address these two elements in either order, and need not proceed to the second where the first is resolved in the negative.'"[16]

### 1

Langiano argues that Officer Rollins violated his constitutional rights by using excessive force.  To prevail on an excessive-force claim, a plaintiff must establish "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[17]  Officers are justified in using deadly force when "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."[18]  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving."[19]  "The excessive force inquiry is confined to whether the [officer] was in danger *at the moment of the threat* that resulted in the

---

[14] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818).

[15] *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) (citing *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007)).

[16] *Pratt v. Harris County.*, 822 F.3d 174, 181 (5th Cir. 2016) (quoting *Thompson v. Mercer*, 762 F.3d 433, 437 (5th Cir. 2014)).

[17] *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009).

[18] *Graham v. Connor*, 490 U.S. 386, 397 (1989).

[19] *Id.* at 396-97.

[officer's] shooting of [the plaintiff]."[20]  "[A]ny of the officers' actions leading up to the shooting are not relevant for the purposes of an excessive force inquiry in this Circuit."[21]  "The Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists,"[22] nor must a police officer allow an individual to aim his weapon before "applying deadly force to ensure their safety."[23]  "Once a defendant invokes qualified immunity, the burden shifts to the plaintiff to show that the defense is not available."[24]

The district court granted summary judgment in favor of Officer Rollins, holding that Langiano did not state a plausible claim of a constitutional violation under the Fourth Amendment.  Langiano argues that summary judgment should not have been granted because Langiano did not pose an immediate danger to the officers.  At summary judgment, "the plaintiff can no longer rest on the pleadings . . . and the court looks to the evidence before it."[25]

The evidence clearly indicates that, at a minimum, Langiano was holding a gun when Officer Rollins entered the motel room.  First, Rollins has consistently testified that Langiano pointed a gun at him.  Second, the audio recording from Officer Guadarrama's body camera supports Officer Rollins' testimony that Langiano was pointing a gun at him.  When Officer

---

[20] *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 493 (5th Cir. 2001).

[21] *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014).

[22] *Ramirez v. Knoulton*, 542 F.3d 124, 130 (5th Cir. 2008) (quoting *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996)).

[23] *Salazar-Limon v. City of Houston*, 826 F.3d 272, 279 n.6 (5th Cir. 2016).

[24] *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010).

[25] *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)).

Rollins first enters the hotel room, he can be heard shouting "Tracy—no, no, no! Gun!" Third, Langiano admitted he was holding a gun when Officer Rollins entered the motel room. In the minutes following the shooting, Officer Rollins told Langiano that Langiano had pointed a gun at him and Langiano responded that he "didn't mean to." Similarly, the day after Langiano was shot, detectives interviewed him, and he stated that when the officers entered his motel room he "had the gun in [his] hand" and did not *think* he pointed it at the officers. Although, at another point in the interview Langiano stated, "I had the pistol in my hand and—I didn't point it at him. But, he shot me twice, and at that time, then, he popped around, behind the door, shot me three more times for good measure," the footage from Officer Guadarrama's body camera shows that Langiano was incorrect about the pause between the shots, calling into question this portion of his testimony. Finally, Langiano's shooting reconstruction expert's account of how the shooting occurred does not preclude Langiano pointing a gun at Officer Rollins.

In light of the evidence, Officer Rollins reasonably perceived a threat of harm. Especially because a police officer need not allow an individual to aim his weapon before "applying deadly force to ensure their safety,"[26] no reasonable jury could find that Officer Rollins's use of force was not reasonable. The district court did not err in granting summary judgment in favor of Officer Rollins.[27]

---

[26] *Salazar-Limon v. City of Houston*, 826 F.3d 272, 279 n.6 (5th Cir. 2016).

[27] To the extent the district court's judgment relied on adverse inferences against Langiano due to his refusal to answer questions about the shooting in deposition, such inferences were not improper. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).

**2**

Langiano also alleges that Officer Rollins violated his Fourth Amendment rights by entering his motel room without a warrant. Although "searches and seizures inside a home without a warrant are presumptively unreasonable,"[28] "[i]f an individual poses a threat to himself, that 'may create an exigency that makes the needs of law enforcement so compelling that a warrantless entry is objectively reasonable under the Fourth Amendment.'"[29] Here, Langiano admits his son called the police to tell them Langiano was suicidal and armed. Moreover, Langiano can be heard on the audio of Officer Guaderrama's body camera stating that he planned to use the handgun on himself. Finally, Langiano admitted that he planned to shoot himself when it was nighttime. Given the threat Langiano posed to himself, the warrantless entry was objectively reasonable.

**B**

The City moved for summary judgment, arguing that it cannot be sued under § 1983 because it did not fail to adopt relevant policies and hiring and training Officer Rollins did not amount to deliberate indifference.

As explained in *Monell v. Department of Social Services*,[30] a city may be liable under § 1983 if it, "under color of some official policy, 'causes' an employee to violate another's constitutional rights."[31] To succeed on a *Monell* claim, plaintiffs "must show '(1) an official policy (or custom), of

---

[28] *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)).

[29] *Clark v. Thompson*, 850 F. App'x 203, 210 (5th Cir. 2021) (per curiam) (unpublished) (quoting *Rice v. ReliaStar Life Ins.*, 770 F.3d 1122, 1131 (5th Cir. 2014)).

[30] 436 U.S. 658 (1978).

[31] *Id.* at 692.

which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy (or custom).'"[32] In the failure to train context, a plaintiff must show: "(1) the training or hiring procedures of the municipality's policymaker were inadequate; (2) the municipality's policymaker was deliberately indifferent in adopting the hiring or training policy; and (3) the inadequate hiring or training policy directly caused the plaintiff's injury."[33]

As explained above, Langiano has failed to state a claim that either the use of force or the warrantless entry violated his Fourth Amendment rights. Because Langiano failed to show a violation of his constitutional rights, the City's actions or inactions could not have led to such a violation.[34] The district court did not err in granting summary judgment in favor of the City.

\* \* \*

The district court's judgement is AFFIRMED.

---

[32] *Newbury v. City of Windcrest*, 991 F.3d 672, 680 (5th Cir. 2021) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

[33] *Benavides v. County of Wilson*, 955 F.2d 968, 972 (5th Cir. 1992) (footnote omitted).

[34] *See Pratt v. Harris County.*, 822 F.3d 174, 184-85 & n.7 (5th Cir. 2016) (affirming grant of summary judgment in favor of municipality because plaintiff failed to show a violation of his constitutional rights); *Fraire v. City of Arlington*, 957 F.2d 1268, 1277 (5th Cir. 1992) (stating a municipality can only be liable when it "causes the constitutional violation at issue").